IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TAYLOR MOHN | ) | |
| | ) | |
| Plaintiff, | ) | No. 23 C 14194 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| GERALD MOTORS INC. | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION & ORDER**

Plaintiff Taylor Mohn brought a five-count complaint against her former employer, defendant Gerald Motors, Inc., a Toyota dealership in Matteson, Illinois. Count I alleges discrimination on the basis of race, religion, and national origin pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1), and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/2-102(A), 103(Q); Count II alleges discrimination on the basis of sex pursuant to Title VII, 42 U.S.C. § 2000e-2(a)(1), and the IHRA, 775 ILCS 5/2-102(A), 103(Q); Count III alleges discriminatory conduct in violation of 42 U.S.C. § 1981; Count IV alleges that defendant created a hostile work environment in violation of Title VII, 42 U.S.C. § 1981, and the IHRA; and Count V alleges retaliation in violation of Title VII, 42 U.S.C. § 2000e-3(a), and the IHRA, 775 ILCS 5/6-101(A). Defendant moves for summary judgment on all counts. For the reasons below, defendant's motion for summary judgment (Doc. 45) is granted as to Count V

1

and denied as to all other counts.

## **BACKGROUND**

Plaintiff is a Black woman, who is not Muslim or of Arab descent.  Defendant is a Toyota dealership that formerly employed plaintiff.  According to plaintiff, two Muslim sales managers of Arab descent, Mohamed Zidan and Mike Smiley, favored Arab, Muslim, or male employees over employees who were not Arab, not Muslim, or female.  Plaintiff maintains that Zidan and Smiley treated her so poorly because of her sex, race, and religion, that she was constructively discharged.  A more detailed factual account follows.

Plaintiff began her employment at the dealership in October 2021.  Plaintiff agreed to a pay plan for individuals with no previous automobile sales experience that provided an initial training salary of $450 for the first four weeks.  After that training period, plaintiff's biweekly base salary was $200 plus commissions on sales.

Plaintiff claims that Zidan and Smiley treated salespeople who were Arab, Muslim, or men better than her in numerous ways.  For example, according to plaintiff, Zidan and Smiley would allocate "leads" to Arab, Muslim, or male salespeople at a far higher rate than her. Plaintiff claims that the sales managers, Zidan and Smiley, had the power to allocate customer leads and would overwhelmingly allocate these leads to Arab, Muslim, male employees. Plaintiff claims that she overheard Zidan ask Smiley numerous times if he could give leads to Attaullah Mundi, an Arab, Muslim, male salesperson.  Based on hearing these conversations, plaintiff asked Smiley is she could get help like Mundi.  According to plaintiff, Smiley verbally

agreed but did not change his pattern of favorable treatment towards Mundi.

Nikeshia Thomas, who worked for the internet sales department, stated in a declaration that she was told to give internet sales leads to Muslim salesmen and was specifically forbidden to give internet leads to Adam Reyes Hornbuckle, a Hispanic, White salesman who was one of plaintiff's colleagues. Hornbuckle claimed in a declaration that the sale managers gave leads and "bones," a slang term for leads so promising as to almost ensure a sale, to Mundi but not to himself or plaintiff.

Additionally, plaintiff claims that Zidan and Smiley would offer support to Arab, Muslim salesmen during negotiations with customers that they would not provide to other salespeople. In her deposition, plaintiff testified that the sales managers would step in to customer negotiations to help Arab, Muslim salesmen finish their sales. Bill Adams, who worked at the dealership as a finance manager when plaintiff was employed there, stated in a declaration that Zidan and Smiley would allow the Arab, Muslim salespeople to sell cars at a lower price than other salespeople would be permitted to sell the car for, thus making it easier for them to close deals and earn commissions.

Beyond not receiving the same favorable treatment as Arab, Muslim salesmen, according to plaintiff, she was also subject to individualized harsh treatment. Plaintiff says that Smiley and Zidan would yell and cuss at her almost daily. This included yelling and cussing at plaintiff when she was in the middle of trying to negotiate deals with customers. According to plaintiff, Smiley yelled the most. Plaintiff recounts one specific instance from August 20, 2022, when Smiley yelled at plaintiff and slammed his wrists against the table as plaintiff was trying to complete a sale with a customer. The customers were alarmed to the point of asking plaintiff if

3

everything was okay and if he was upset with her. Plaintiff recalls how difficult it was to not cry in front of the customers when subjected to this sort of treatment. When customers were not present, plaintiff would cry at work on a near daily basis.

Other employees offer similar accounts of the way plaintiff was treated by the Zidan and Smiley. Hornbuckle stated that he heard Smiley call plaintiff a "stupid n-word" behind her back.[1] In his declaration, Hornbuckle stated that:

> [Plaintiff] was yelled at and cursed at on a daily basis by Smiley and somewhat by Zidan, but not as often. It was offensive and rude. I saw that the actions of Smiley and Zidan affected Taylor, and I saw her cry several times after they yelled at her. They even yelled at her when she was in front of customers.

> Similarly, in his declaration, Adams stated that: "[Plaintiff] was yelled at and sworn at by Smiley and Zidan on a regular basis while she worked there. I saw it."

Throughout the course of her employment, plaintiff observed that the sales managers discriminated among customers based on race and religion. Plaintiff testified that she was told to upcharge Black customers more than other customers. According to plaintiff, her sales managers pushed her to sell products, such as certain protection plans, that were "extra charges and they did that mostly with Black customers." Mohn Dep. at 142. Plaintiff also testified that the managers would not charge Muslim and Arab customers for these protection packages and would even reduce the dealership markups on new vehicles for these customers.

Hornbuckle's declaration describes similar discriminatory practices in more lurid detail. Hornbuckle described Black female customers as being treated the worst. He was told on multiple occasions, in reference to Black female customers, to "bust the stupid n-word."

---

[1] The court will use "n-word" in the place of the actual racial epithet.

Hornbuckle claimed that Smiley and Zidan required salespeople to force upcharges on Black customers. In addition, when a Black customer came in with a lease buyback, the dealership would "mischarge and overcharge them by giving the employee a lower sales residual price than what was agreed to in the contract." According to Hornbuckle, when he brought a sale to the sales managers, they would ask whether the "customers were women, the race of the customer, and whether the customer was Muslim. The Muslim Sales managers gave better pricing to Muslims and overcharged Black customers." Hornbuckle also said that the sale managers all referred to Black customers as "n-words" and was told to shut up when he complained about it.

Adams, a finance manager, offered similar accounts in his declaration. Like Hornbuckle, Adams stated that the sales managers would ask about the race, religion, and sex of the customer, and "[b]ased upon the race and religion of the customer, Smiley would adjust pricing." Adams said that the sales managers would refer to Black customers and employees as "n-words." Adams stated that the managers would put code words on papers when Black customers came in to indicate that they could be upcharged.

The logic behind this pricing discrimination was reflected in a refrain that Adams said was frequently repeated by the managers: we "can screw the n-words." According to Adams, after a day where multiple Black customers with bad credit had visited the dealership, Smiley commented: "Call the zoo to see if any monkeys escaped last night." Adams stated that when a salesperson had trouble getting a Black female customer to agree to the upcharges that the sales managers pushed, Smiley would make statements like "Stop thinking for the customer, She a dumb N-word, go back and crack her." According to Adams, comments like this were frequent. The practice of overcharging Black customers was so pervasive that apparently Toyota reached out to the dealership to complain about the practice. In response, Adams was told to "overcharge

5

White Women and Black customers as they both were stupid and gullible."

Plaintiff also claims that the Zidan and Smiley "took" sales away from her. Typically, in instances where sales were completed by two salespeople—for example when a customer first talked to one salesperson and then came back the next day to complete the deal with another salesperson—the salespeople involved would be credited with a "half sale." The record is not entirely clear on the half-sale mechanism, but it implies that a half sale would entitle a salesperson to some portion, if not half, of the commission for that sale. It was up to the sales manager supervising a deal to determine which salespeople to credit for the sale. Plaintiff claims that on ten to twelve occasions throughout her employment she was entitled to a half sale and did not receive credit, despite showing her managers proof of her contact with the purchasing customer.

In her final days working at the dealership, the sales managers informed plaintiff that there was a policy change regarding how sales would be credited. Whereas previously a salesperson who contacted a customer who bought a car from the dealership would be credited with a half sale, after the change, a salesperson would have to make three forms of contact to be credited with a half sale.

Plaintiff claims that she lost two additional sales through the retroactive enforcement of this policy change. According to plaintiff, these half sales would have yielded approximately $4,000 in commission. On August 25, 2022, plaintiff's day off, customers who had originally reached out to plaintiff to purchase two vehicles came to the dealership to close the deal. The entire commission was given to Eddie Easha, a colleague. Plaintiff did not receive any credit for these two sales. When plaintiff returned to work on August 26, 2022, she was confused as to

6

why she did not receive half-credits for the sales.  One of the sales managers informed her of the policy change, which had been implemented on her off day.  The kicker, according to plaintiff, is that she believed this policy applied only to her.  Plaintiff resigned on August 29, 2022.

## LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden, and the court must view all facts in the light most favorable to the nonmovant and draw all reasonable inferences in their favor.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  But the nonmovant must do more than raise "some metaphysical doubt as to the material facts."  Id. at 586.  Rather, "[t]o survive summary judgment, the nonmoving party must establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor."  Gordon v. FedEx Freight, Inc., 674 F.3d 769, 772 (7th Cir. 2012).

## DISCUSSION

Defendant moves for summary judgement on five different bases.  Because the movant bears the burden to show that there is no dispute of material fact and the movant is entitled to judgement as a matter of law, the court's analysis will analyze each of defendant's five arguments in turn.

### I.    Adverse employment action (Counts I-V)

Defendant argues that plaintiff's claims fail because she was not subject to an adverse employment action, which is a required element of all five of her claims.  According to

defendant, the only adverse employment action alleged by plaintiff is constructive discharge.
Defendant argues that plaintiff cannot meet the standard for constructive discharge for five
reasons.  First, plaintiff resigned.  Second, plaintiff's allegations of favoritism and yelling do not
constitute intolerable working conditions.  Third, the conduct she faced was consistent, and
plaintiff cannot explain how the unchanged circumstances that she endured for almost a year
suddenly became intolerable.  Fourth, plaintiff testified that she felt comfortable confiding in
Zidan and Smiley and complimented them after she left defendant's dealership.  According to
defendant, no reasonable jury could find that these same two managers were responsible for
creating an intolerable work environment.  Fifth, even if the working conditions were intolerable,
plaintiff has not provided any evidence that the alleged conditions were based on unlawful
discrimination.  Defendant points out that neither Smiley or Zidan made any comments about
plaintiff being a woman, Black, or Christian to her face.

Plaintiff responds that she was subject to an adverse employment action, which need not
amount to a constructive discharge.  Plaintiff argues that her loss of pay is an adverse
employment action.  In addition, plaintiff argues that she has established the requisite facts to
establish constructive discharge.  Plaintiff's primary response to defendant's argument that she
suffered no constructive discharge is that her pay was cut, a condition that is not addressed by
defendant.

Plaintiff points out that in her deposition she stated that she could take the abuse—being
yelled at and humiliated—but the drastic reduction in pay as a result of sales being taken away
from her was the final straw.  Plaintiff also argues that she gave her employer sufficient time to
correct the problem, as she asked her managers for help in getting the type of leads that she felt
were being disproportionately allocated to Arab, Muslim, salesmen, especially Mundi.

8

Afterwards, instead of receiving the help she asked for she got more of the same if not worse, including yelling, cussing, and a dramatic cut in sales.

The court begins its analysis by noting that defendant's premise is flawed; not all five of plaintiff's claims require an adverse employment action. Defendant is correct that the Title VII discrimination claims alleged in Counts I and II require an adverse employment action. See Ortiz v. Werner Enterprises Inc., 834 F.3d 760, 765 (7th Cir. 2016) (explaining that on summary judgment a court must consider "whether the evidence would permit a reasonable factfinder to conclude that [a proscribed factor] caused the discharge or other adverse employment action"). The 42 U.S.C. §1981 discrimination claim alleged in Count III also requires an adverse employment action. See Wince v. CBRE, Inc., 66 F. 4th 1033, 1041 (7th Cir. 2023) (applying same standard to Title VII and § 1981 race discrimination claims). Likewise, plaintiff's Title VII retaliation claim alleged in Count V requires an adverse employment action. Lesiv v. Illinois Central Railroad Co., 19 F.4th 903, 911 (7th Cir. 2022) (explaining that "[t]o defeat summary judgment, [plaintiff] must offer evidence from which a reasonable jury could find…he suffered an adverse employment action").

But the hostile work environment claim alleged in Count IV has no such required element. See Trahanas v. Northwestern University, 64 F.4th 842, 854 (7th Cir. 2023) (listing the elements of a hostile work environment claim). With the understanding that defendant's argument has no relevance to Count IV, the court proceeds to analyze the substance of defendant's argument.

Viewing all facts in the light most favorable to the nonmovant and drawing all reasonable inferences in her favor, the court agrees with plaintiff. Plaintiff is correct that she need not show a constructive discharge to show an adverse employment action. Adverse employment action is

a broader category than constructive discharge; it includes constructive discharge, but it is not limited to it. See E.E.O.C. v. Univ. of Chicago Hospitals, 276 F.3d 326, 331 (7th Cir. 2002) (explaining that "[c]onstructive discharge, like actual discharge, is a materially adverse employment action").

The Seventh Circuit has described an adverse employment action as "a materially adverse change in the terms and conditions of employment that is more disruptive than a mere inconvenience or an alteration of job responsibilities." Alamo v. Bliss, 864 F.3d 541, 552 (7th Cir. 2017). Actions meeting this standard include: "(1) diminishing an employee's compensation, fringe benefits, or other financial terms of employment, including termination; (2) reducing long-term career prospects by preventing him from using the skills in which he is trained and experienced, so that the skills are likely to atrophy and his career is likely to be stunted; and (3) changing the conditions in which an employee works in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment." Id. (internal citations and quotations omitted).

To show a constructive discharge, on the other hand, plaintiff must demonstrate "that the defendant made the working conditions so intolerable as to force a reasonable employee to leave." Vitug v. Multistate Tax Comm'n, 88 F.3d 506 (7th Cir. 1996).

At the summary judgment stage, the court must determine whether there exists some genuine issue for trial such that a reasonable jury could find that plaintiff was subject to an adverse employment action. Constructive discharge is one of several possible adverse employment actions and need not control the court's inquiry at this stage. Defendant's singular focus on whether plaintiff has demonstrated a genuine dispute of fact as to whether she was

constructively discharged is misplaced. As a result, many of defendant's arguments are not relevant. Nevertheless, some of defendant's arguments, addressed below, remain relevant to the issue of adverse employment action.

In its reply brief, defendant argues that there is no evidence that plaintiff's pay was taken from her. Defendant contends that plaintiff's position that her pay was reduced contradicts her prior sworn testimony that did not mention pay as a reason for quitting. Defendant goes so far as to urge the court to ignore the pay argument under the "sham-affidavit rule."

First, contrary to defendant's assertion, plaintiff stated in her deposition that "it was to the point where I wasn't getting any customers or, like I said, getting credit for half work, which is what prompted me to leave." Mohn Dep. at 166 (emphasis added). Here, plaintiff is referencing the half-commissions she said were denied to her. Plaintiff also testified that the change in policy for half-sales, which was instituted on her day off and which plaintiff believed applied only to her, affected her decision to end her employment at the dealership. Mohn Dep. at 91. Plaintiff's affidavit does not contradict her prior sworn testimony.

Second, defendant's argument assumes that plaintiff must show that her reduction in pay was connected to her decision to resign. While this may be correct in the context of constructive discharge, plaintiff here needs only to show an adverse employment action, as discussed above. An adverse employment action can include "diminishing an employee's compensation," regardless of whether it causes the employee to resign. Alamo, 864 F.3d at 552.

The court finds that there is a genuine dispute of material fact as to whether plaintiff was subjected to an adverse employment action. Plaintiff testifies that she did not receive pay for work that she performed. Plaintiff also testifies that she was yelled at while in the middle of

11

interacting with customers. Declarations from two other employees, Adams and Hornbuckle, also claim that plaintiff was consistently yelled and cussed at by her managers, including in front of customers. These factual assertions implicate, arguably, all three categories of adverse employment actions outlined by the Seventh Circuit in <u>Alamo v. Bliss</u>. 864 F.3d at 552.

While defendant denies that Smiley and Zidan engaged in these behaviors, it is inappropriate for the court to make credibility determinations on summary judgement. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 255 (1986). There remains a genuine dispute of fact as to whether plaintiff was subject to an adverse employment action. Consequently, defendant has not carried its burden to show that the undisputed facts entitle it to judgment as a matter of law on any count because plaintiff did not suffer an adverse employment action.

## II.    Discriminatory Intent (Counts I and II)

Counts I and II both allege discrimination on the basis of a protected characteristic in violation of Title VII and the IHRA. Defendant argues that any adverse employment action taken against plaintiff was not due to a protected characteristic. According to defendant, there is no genuine dispute of fact as to this contention. Defendant is correct that, in seeking to defeat this motion for summary judgment, plaintiff may proceed under the reasonable factfinder method from <u>Ortiz v. Werner Enterprises Inc.</u>, 834 F.3d 760, 765 (7th Cir. 2016). The <u>Ortiz</u> method asks: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." <u>Id.</u>

Defendant stakes its argument on the fact that neither Zidan or Smiley made comments to plaintiff's face about her being a woman, Black, or non-Muslim. This fact is uncontroverted.

According to defendant, this shows that there is no genuine factual dispute as to whether plaintiff suffered an adverse employment action against her due to a protected characteristic. But the words said or not said to plaintiff's face are not the only evidence in the record as to the cause of the alleged adverse employment action suffered by plaintiff. The court will separately analyze the evidence for the proscribed factors in the two counts at issue, race/religion and sex.

A. Race/ religion

While plaintiff admits that Smiley and Zidan did not make comments about her race to her face, there is other evidence in the record that bears on whether race caused the alleged adverse employment action. Hornbuckle heard Smiley, while in the managers' area and out of the earshot of plaintiff, call plaintiff "a stupid n-word." Hornbuckle also stated that the managers made degrading comments about plaintiff behind her back on several occasions, but he does not specify if these additional comments were racial.

In addition to calling plaintiff "a stupid n-word," there is evidence in the record that the sales managers treated customers differently according to their race and treated Black customers especially poorly. Plaintiff testified that she was encouraged by the sales managers to upcharge Black customers more than other customers.

According to Hornbuckle, when he brought a deal to the sales managers for approval, they would ask whether the "customers were women, the race of the customer, and whether the customer was Muslim." Hornbuckle stated that, "[t]he Muslim Sales managers gave better pricing to Muslims and overcharged Black customers." Hornbuckle also said that the sales managers all referred to Black customers as "n-words," and he was told to shut up when he complained about it. He was told on multiple occasions, in reference to closing sales with Black

13

female customers, to "bust the stupid n-word."

Adams, a finance manager at the dealership, offers a similar account of frequent racist comments directed at Black customers and employees. According to Adams, the sales managers would regularly refer to Black customers and <u>employees</u> as "n-words." Adams' account echoes the disparate treatment of Black customers observed by plaintiff and Hornbuckle. Salient examples from Adams' declaration are listed below:

- The sales managers would put codes on paper when Black customers came in because, as the sales managers frequently said, we "can screw the n-words" as they were "stupid" or "suckers."

- Smiley referred to Black individuals as "animals," "orangutans," and "monkeys."

- After multiple Black customers came into the dealership with bad credit one day, Smiley said, "[c]all the zoo to see if any monkeys escaped last night."

- When a sales associate would meet resistance from Black female customers who did not want to pay for the upcharges that the sales managers directed their staff to push on Black female customers, Smiley would frequently make comments such as: "Stop thinking for the customer, She a dumb N-word, go back and crack her."

- Defendant's practice of overcharging Black customers was so pervasive that Toyota complained to the defendant about the practice.

Defendant's arguments mainly focus on the level of verbal racial abuse necessary to create a hostile work environment. According to defendant, a single racist remark behind an employee's back is not sufficient to create a racially hostile work environment. But the issue here is not whether defendant created a hostile work environment. Rather, the inquiry here is

"whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."

Defendant's other response to this material in the record is to urge the court to strike it because it is "irrelevant." The court disagrees. This material is circumstantial evidence that is probative of whether plaintiff's race caused the alleged adverse employment action against her. Defendant's contention that these statements "do not create a question of fact as to any of her claims hinging upon constructive discharge" is plainly incorrect given the standard outlined in Ortiz.[2] 834 F.3d at 765. The court in Ortiz held that, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself….Evidence is evidence. Relevant evidence must be considered and irrelevant evidence disregarded, but no evidence should be treated differently from other evidence because it can be labeled 'direct' or 'indirect.'" Id.

Of course, just because there is evidence in the record that Smiley and Zidan held racist attitudes towards Black customers, Black employees, and plaintiff does not mean that the alleged adverse employment action against defendant, a Black woman, was due to her race. A reasonable factfinder could find the evidence too weak or choose not to find certain accounts credible. Nevertheless, the court finds that the evidence in the record would permit a reasonable factfinder to conclude that plaintiff's race caused the alleged adverse employment action. Consequently, defendant has failed to carry its burden to show that the undisputed facts entitle it to a judgement as a matter of law that race did not cause the alleged adverse employment action

---

[2] Recall that, according to defendant, all of plaintiff's claims "hing[e] on constructive discharge."

against plaintiff.[3]

B. Sex

While plaintiff admits that Smiley and Zidan did not make comments about her sex to her face, there is other evidence in the record that bears on whether sex caused the potential adverse employment action. This evidence primarily relates to the sales managers' treatment of female customers, especially Black female customers. Much of this evidence is the same evidence that was referenced in the section above, as some of the alleged racial comments made by Smiley were directed specifically at Black women.

Hornbuckle's declaration contains evidence of Smiley and Zidan's alleged discriminatory attitude towards women. According to Hornbuckle, when he brought a sale to the sales managers, they would ask, among other things, whether the "customers were women." Hornbuckle said that the sales managers required their salespeople to overcharge Black customers and regularly overcharged Black, female customers. Hornbuckle stated that Black, female customers were treated the worst.

Adams' declaration contains more evidence specifically relevant to sex. Adams said that the sales managers specifically targeted Black female customers for upcharges. And when salespeople met resistance from these customers, it would prompt comments from Smiley such as "[s]top thinking for the customer, She a dumb N-word, go back and crack her." As mentioned in the section above, Adams said that Toyota reached out to the dealership to complain about the

---

[3] The court recognizes that much of the briefing on both sides concerns whether there is a genuine dispute as to whether defendant treated Arab and Muslim employees favorably compared to others. There is enough evidence in the record on discrimination against Black people to deny the motion for summary judgment on Count I, which alleges racial and religious discrimination, regardless of whether defendants treated Arab and Muslim employees better than others. Thus, the court declines to further analyze the issue.

practice of overcharging Black female customers. Particularly relevant to sex is Adams' account of the sales managers' response to Toyota's complaint. In response, Adams was told to "overcharge White Women and Black customers as they both were stupid and gullible." Adams also said that the sales managers would overcharge customers on lease buy backs by lying about the residual value and finding other extra charges to apply. Adams said this was "regularly done to Black customers and women who were not Muslim."

Again, defendant's response to the evidence included in the declaration is to urge the court to strike it. According to defendant, these declarants' "generalizations without specific facts supporting [their] conclusory assertions are impermissible." The court disagrees. While some of the statements contained in the declaration alone may have been conclusory, the statements referenced above are sufficiently specific, as they reference specific sales practices and comments made by the sales managers.

There is evidence in the record that Zidan and Smiley held discriminatory attitudes towards women, especially Black women. Unlike on the issue of race, the record contains no evidence of comments about plaintiff specifically. While that absence may render the conclusion that plaintiff suffered adverse employment action due to her sex more difficult to reach, the court cannot say that no reasonable factfinder could make such a finding. This factual question is especially challenging due to the entanglement of Smiley and Zidan's alleged discriminatory attitudes towards sex and race, namely Smiley and Zidan's attitudes towards Black women. Consequently, defendant has failed to show that the undisputed facts entitle it to judgment as a matter of law that sex did not cause the alleged adverse employment action against plaintiff.

17

III.    **"But for" race causation (Count III)**

Count III is a claim for racial discrimination under 42 U.S.C. §1981.  Generally, "the elements and methods of proof for § 1981 claims are 'essentially identical' to those under Title VII."  Brown v. Advocate S. Suburban Hosp. & Advocate Health & Hospital Corp., 700 F.3d 1101, 1104 n.1 (7th Cir. 2012).  But, as defendant notes, there is a difference.  Under Title VII, a plaintiff needs only to prove that race was a "motivating factor," at least for purposes of declaratory and injunctive relief.  Comcast Corporation v. National Ass'n of African American-Owned Media, 589 U.S. 327, 337 (2020).  But under § 1981 a plaintiff "bears the burden of showing that race was a but-for cause of [her] injury."  Id. at 333.

Defendant argues that because plaintiff believes that the primary factor behind her mistreatment was that she was a woman and not Muslim, race cannot have been a but-for cause of her injury.  Plaintiff contests this characterization of her deposition and maintains that race was a factor in the way she was treated.  Plaintiff points to much of the same evidence that was discussed in Section IIA, above, including Smiley and Zidan's frequent use of the n-word, the dealership's practice of overcharging Black customers, and Smiley's use of other racial slurs for Black people, such as calling them "monkeys," "animals," and "orangutangs."

The court disagrees with defendant.  Defendant's argument misunderstands the concept of but-for causation.  One outcome can have multiple but-for causes. See Bostock v. Clayton County, 590 U.S. 644, 656 (2020) (explaining that "[o]ften, events have multiple but-for causes").  Even if plaintiff did believe race to be less of a factor than sex or religion, which plaintiff contests, it does not follow that race could not have been a but-for cause of her injury.

Further, defendant cites no authority indicating that plaintiff's burden "of showing that

18

race was a but-for cause of [her] injury" is a subjective one. That is, even if plaintiff conceded

that she thought race was only a minor factor in her injury, that does not preclude a factfinder

from determining, considering all of the evidence, that race was a but-for cause of her injury. Of

course, plaintiff has not conceded this. Given the evidence on the record, a reasonable factfinder

could conclude that race was a but-for cause of the injury plaintiff suffered. Consequently,

defendant has not carried its burden to show that the undisputed facts entitle it to judgment as a

matter of law that race was not a but for factor of plaintiff's claimed injury.

## IV.     Hostile work environment (Count IV)

Count IV alleges that defendant created a hostile work environment in violation of Title

VII, 42 USC §1981, and the IHRA. Defendant is correct that, "[g]enerally, in analyzing

employment discrimination claims brought under the IHRA, Illinois courts have adopted the

analytical framework set forth in United States Supreme Court decisions addressing claims

brought under Title VII." Martinez v. Northwestern University, 173 F.Supp.3d 777, 783 (N.D.

Ill. 2016) (internal quotations omitted). Accordingly, the court will analyze plaintiff's IHRA

hostile work environment claim alongside with her Title VII hostile work environment claim.

"To establish a hostile work environment claim, a plaintiff must show: (1) the work environment

was both subjectively and objectively offensive; (2) the harassment was based on membership in

a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer

liability." Trahanas v. Northwestern University, 64 F.4th 842, 854 (7th Cir. 2023).

Defendant moves for summary judgment on plaintiff's hostile work environment claim

on two bases. First, according to defendant, plaintiff has not provided sufficient evidence of a

hostile work environment to survive summary judgment because "[p]laintiff could not provide

any specific examples or dates of alleged conduct."

Second, defendant argues that the evidence shows that it can avoid liability under the Faragher-Ellerth defense. Because this is a supervisor harassment claim, an employer is strictly liable only if the harassment culminates in a tangible employment action. Since, according to defendant, no tangible employment action occurred, defendant can raise the affirmative Faragher-Ellerth defense. Under this defense an employer can avoid liability by showing that: "(1) it exercised reasonable care to prevent and correct promptly any…harassing behavior; and (2) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm." Trahanas, 64 F.4th at 854.

Defendant argues that the undisputed evidence shows that it has met the elements of this defense. According to defendant, the first element of the defense is satisfied because the dealership handbook, which plaintiff acknowledged receiving, contained a detailed anti-harassment policy. The second element of the defense is satisfied because plaintiff "acknowledged failing to report any discrimination to HR or the management/owners listed in the handbook."

Plaintiff responds that there is sufficient evidence in the record to establish the four elements of a hostile work environment claim. To support the first element and third elements—that the environment was objectively and subjectively offensive, and that the conduct was severe or pervasive—plaintiff points to evidence of the near constant yelling and cussing she was subjected to. To support the second element, that the harassment was based on membership in a protected class, plaintiff points to the evidence of the discriminatory attitudes of Zidan and Smiley.

20

The fourth element, a basis for employer liability, is governed by the Faragher-Ellerth defense claimed by defendant. Plaintiff argues that her reduction in pay qualifies as a tangible employment action for a hostile work environment claim, thus foreclosing the availability of the Faragher-Ellerth defense. Plaintiff contends in the alternative that if the Faragher-Ellerth is available to defendant, plaintiff reported the harassment to the individuals that defendant's harassment policy directs employees to report to.

The court agrees with plaintiff. Defendant's contention that "no evidence of a hostile work environment has been presented," is not supported by the record. As discussed in the sections above, there is evidence that plaintiff was routinely cussed and yelled at by Smiley and Zidan, including in font of customers.

Defendant wishes away these parts of the record by labelling them "conclusory." But the record contains more than conclusory allegations that Smiley and Zidan created a hostile work environment. In Green v. Illinois Dept. of Children and Family Services, 439 F.Supp.2d 841, 854 (N.D. Ill. 2006), the court granted summary judgment on a hostile work environment claim when the lack of evidence on the record made it impossible for the court to determine "the frequency of the claimed discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with Green's work performance."

In contrast, here, the record provides information that bears on these factors. For example, plaintiff's testimony recounts an episode at the end of her employment, on August 20, 2022, where Smiley yelled at her in front of a customer and slammed his wrists on the desk. Plaintiff also testified that she was "crying on a [near] daily basis at the dealership." Mohn Dep.

21

at 158.  Adams stated that "[plaintiff] was yelled at and sworn at by Smiley and Zidan on a regular basis."  Hornbuckle stated that "[plaintiff] was yelled at and cursed at on a daily basis by Smiley and somewhat by Zidan, but not as often.  It was offensive and rude…. I saw her cry several times after they yelled at her.  They even yelled at her when she was in front of customers."  There is enough evidence in the record for a reasonable factfinder to determine the frequency and severity of the conduct and the extent to which it was humiliating and interfered with plaintiff's work performance.[4]

The court also agrees with plaintiff that her alleged reduction in pay could qualify as a tangible employment action for a hostile workplace claim.  While the Supreme Court did not provide an exhaustive definition of possible tangible employment actions in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 762 (1998), it consistently associated tangible employment actions with economic harm.  For example, the Court stated that "[a] tangible employment action in most cases inflicts direct economic harm."  Id.  In justifying the separation of supervisor and coworker hostile workplace claims, the court explained that: "[t]angible employment actions fall within the special province of the supervisor.  The supervisor has been empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control."  Id. (Emphasis added).

The contested factual situation here—whether the sales managers used their unilateral authority over the allocation of credit for sales to deny plaintiff commissions she earned—fits the description of the type of situation the Supreme Court was addressing in Ellerth.  Plaintiff

---

[4] "In measuring the severity of harassing conduct, the status of the harasser may be a significant factor—e.g., 'a supervisor's use of [a racial epithet] impacts the work environment far more severely than use by co-equals.'"  Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 278 (4th Cir. 2014) (quoting Rodgers v. W.–S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993).  There is, of course, evidence in the record as to the supervisory status of the harassers, which also enables a factfinder to determine the severity of the conduct.

maintains that her supervisors were empowered to make economic decisions affecting her, and that they used that power to inflict economic harm on her. Of course, as discussed above, there is a dispute of fact as to whether Zidan and Smiley actually did so.

Consequently, defendant has failed to carry its burden on summary judgment. There is a genuine dispute of fact as to whether Zidan and Smiley created a hostile work environment. Additionally, defendant has failed to show that the undisputed facts entitle it to a judgment as a matter of law under the Faragher-Ellerth defense, because there is a genuine factual dispute as to whether a tangible employment action occurred.

## V.     Retaliation (Count V)

Count V alleges retaliation under Title VII, 42 USC §1981, and the IHRA. Defendant correctly argues that a retaliation claim requires proof that plaintiff suffered an adverse employment action because she engaged in a statutorily protected activity. A "[p]rotected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." Grana v. Ill. DOT, 232 F. Supp. 2d 879, 885 (N.D. Ill. 2002). Defendant advances two arguments for summary judgment. First, defendant argues that plaintiff suffered no adverse employment action. Section I, above, explains why there remains a genuine dispute of fact on this issue. Second, defendant argues that plaintiff has not articulated what condict she believes she was retaliated for. Therefore, according to defendant, plaintiff cannot show a causal link between the unarticulated protected activity and the alleged adverse employment action.

Plaintiff responds that that she complained to Smiley about favoritism, which was a protected activity. Plaintiff maintains that a month after that compliant Smiley and Zidan

stopped crediting her for the sales she made. This, according to plaintiff, was retaliation for her compliant to Smiley.

The court agrees with defendant. To defeat summary judgment on a Title VII retaliation claim, plaintiff "must offer evidence from which a reasonable jury could find: (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action." Lesiv v. Illinois Central Railroad Co., 39 F.4th 903, 911 (7th Cir. 2022) (internal quotation omitted). Assuming without deciding that plaintiff has shown a genuine dispute of fact as to the first two elements, plaintiff has failed to offer evidence from which a reasonable jury could find a causal link between the protected activity and the adverse action.

For plaintiff to satisfy the causation requirement, plaintiff must show that defendant "would not have taken the adverse action but for her protected activity." Greengrass v. International Monetary Systems Ltd., 776 F.3d 481, 486 (7th Cir. 2015). The record contains no clear evidence on the timing of when plaintiff made complaints to management. In her deposition, plaintiff testified that she "had said something to [Zidan and Smiley] about three, four times." Mohn Dep. at 59. It is unclear when during plaintiff's 11 months of employment at the dealership she made these complaints. Plaintiff testified that she did not have any complaints that she was not being treated fairly for the first two to three months. Other than that fact, there is almost nothing in the record to anchor these complaints to a certain time.

The lack of timeframe for plaintiff's complaints makes it impossible for a reasonable factfinder to infer "but for" causation because of suspicious timing. Circumstantial evidence of a causal link "may include suspicious timing." Greengrass, 776 F.3d at 486. In briefing, plaintiff

24

attempts to make a suspicious timing argument: "The timing [of the adverse action] was less than a month, thus giving rise [the inference] to that the reduction in her pay was also retaliatory." But the court cannot find any support for the timing of the adverse action occurring less than a month after plaintiff's complaints, because there is no evidence anchoring plaintiff's complaints to a certain timeframe.

Relatedly, the lack of timeframe for plaintiff's complaint makes it impossible to determine which, if any, of the alleged adverse employment actions to attribute to retaliation for the complaint. As discussed above in Section I, much of the evidence in the record regarding the adverse action included behavior from Smiley and Zidan that spanned the course of most of plaintiff's employment at the dealership. Plaintiff argues that the August 26, 2022, episode where Smiley and Zidan abruptly informed plaintiff that they had changed the requirements for half-sale credit to justify taking away credit for two sales was retaliation for her complaints. But without knowing when the complaints occurred, a reasonable factfinder cannot conclude that the complaints were the but-for cause of this alleged adverse action.

Plaintiff also fails to provide evidence that connects the alleged adverse employment actions to her complaints. Separate from the two sales on August 26, 2022, plaintiff testifies that the managers had taken away deserved credit for ten to twelve half sales throughout her employment at the dealership. The yelling, screaming, and cussing, including in front of customers, occurred throughout the course of her employment. From reviewing the record, there is no way for a reasonable factfinder to separate the adverse action alleged to be in retaliation for plaintiff's complaints from the alleged adverse action she suffered throughout most of her tenure at the dealership. There is nothing in the record ruling out the possibility that the managers would have treated her the same way regardless of whether she made the complaint.

25

Since plaintiff has failed to offer evidence showing a causal link between her protected activity and the adverse action, a reasonable factfinder could not find in her favor on her retaliation claim.  Consequently, summary judgment is granted on Count V.

## **CONCLUSION**

For the above reasons, defendant's motion for summary judgment (Doc. 45) is granted as to Count V and denied as to all other counts.  The parties are directed to file a joint status report using this court's form no later than March 11, 2025.

ENTER:

**Robert W. Gettleman**
**United States District Judge**

DATE: February 20, 2025

26